**F I L E D**

**UNITED STATES COURT OF APPEALS**

**AUG 4 2003**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

TODD CHRISTOPHER MANN,

    Defendant - Appellant.

No. 02-6295
(D.C. No. CR-01-23-T)
(W.D. Okla.)

ORDER AND JUDGMENT[*]

Before **EBEL**, **HENRY**, and **HARTZ**, Circuit Judges.

Defendant-Appellant, Todd Christopher Mann, challenges his conviction on

direct appeal, arguing that neither his guilty plea nor his waiver of appeal in his

plea agreement should be binding because the government acted in bad faith to

circumvent the agreement's terms. The government submits a motion to dismiss

for lack of jurisdiction, but waivers of appeal are not jurisdictional. We instead

---

[*] After examining appellant's brief and the appellate record, this panel has
determined unanimously that oral argument would not materially assist the
determination of this appeal. See Fed. R. App. P. 34(a)(2) and 10th Cir. R.
34.1(G). The case is therefore ordered submitted without oral argument. This
Order and Judgment is not binding precedent, except under the doctrines of law of
the case, res judicata, and collateral estoppel. The court generally disfavors the
citation of orders and judgments; nevertheless, an order and judgment may be
cited under the terms and conditions of 10th Cir. R. 36.3.

evaluate waivers of appeal under the principles of contract.  See generally United States v. Black, 201 F.3d 1296, 1300 (10th Cir. 2000) (discussing waivers of appeal).

"Whether government conduct has violated a plea agreement is a question of law which we review de novo."  United States v. Hawley, 93 F.3d 682, 690 (10th Cir. 1996).  In evaluating allegations of a breach of agreement, we examine the nature of the promise made, and do so in light of a defendant's reasonable understanding of the promise at the time he plead guilty.  United States v. Brye, 146 F.3d 1207, 1210 (10th Cir. 1998); United States v. Peterson, 225 F.3d 1167, 1170-71 (10th Cir. 2000).  We find no evidence of bad faith or breach of promise in the government's actions, and hold defendant's waiver of his appeal to be binding.

On February 6, 2001, Mann was charged with a five-count indictment for drug-related crimes.  On November 8, 2001, pursuant to an agreement with the federal government, Mann plead guilty to a single charge of conspiracy to manufacture, possession with intent to distribute, and distributing fifty grams or more of a mixture or substance containing a detectable amount of methamphetamine in violation of 21 U.S.C. §841(a)(1).  Mann specifically agreed

to waive his right to appeal.[1]  He was sentenced at the bottom of the guideline range to 263 months.  (Sentencing Tr. Vol. II at 183.)

---

[1]  The language of Mann's waiver of his right to appeal was:

Defendant understands that a sentencing guideline range for his case will be determined by the Court under guidelines issued by the U.S. Sentencing Commission.  Defendant also understands that the Court has jurisdiction and authority to impose any sentence within the statutory maximum for the offense(s) to which he is pleading guilty. Defendant further understands that Title 18, United States Code, Section 3742, gives him the right to appeal the judgment and sentence imposed by the Court.  Acknowledging all this, defendant in exchange for the promises and concessions made by the United States in this plea agreement, knowingly and voluntarily waives his right to appeal or collaterally challenge:

a.  Defendant's guilty plea and any other aspect of his conviction, including but not limited to any rulings on pretrial suppression motions or any other pretrial dispositions of motions and issues.

b.  Defendant's sentence as imposed by the Court and the manner in which the sentence is determined, provided the sentence is within or below the applicable guideline range determined by the Court to apply to this case, even if the Court rejects one or more of the positions of the United States or the defendant set forth in paragraph 7 concerning the application of the U.S. Sentencing Guidelines; provided that (i) defendant specifically does not waive the right to appeal an upward departure from the sentencing guideline range determined by the Court to apply to this case, and (ii) his waiver of rights to appeal and to bring collateral challenges shall not apply to appeals or challenges based on changes in the law reflected in Tenth Circuit or Supreme Court cases decided after the date of this agreement which are held by the Tenth Circuit or Supreme Court to have retroactive effect.

(Plea Agreement ¶ 8, ROA Doc. No. 44 [hereinafter Plea Agreement].)

As part of the plea agreement, the government informed Mann in relevant part that it intended to present evidence at his sentencing to the effect that: (1) the government was aware that Mann was responsible for 1.5 kilograms or more of actual methamphetamine; and (2) the government was aware of factors that might cause Mann's offense level to be enhanced for being a manager or supervisor of a criminal activity that involved five or more participants under U.S.S.G. §3B1.1(b),[2] or to be enhanced for being an organizer, leader, manager, or supervisor of other criminal activity under U.S.S.G. §3B1.1(c).[3] (Plea Agreement ¶7, ROA Doc. No. 44 [hereinafter Plea Agreement].) The government further reserved the right to inform the probation office and the court of all other activities the government deemed relevant to sentencing. (Id. at ¶17.) Mann noted his objection to the two positions indicated, but signed the agreement in full. (Id. at ¶19.)

_____

[2] The text of U.S.S.G. §3B1.1(b) reads:

Based on the defendant's role in the offense, increase the offense level as follows: . . . (b) If the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive, increase by 3 levels.

[3] The text of U.S.S.G. §3B1.1(c) reads:

If the defendant was an organizer, leader, manager or supervisor in any criminal activity other than described [above], increase by 2 levels.

Mann and the government also negotiated over the language of his Presentencing Report (PSR). Mann admitted that the government could attribute 3.3 kilograms (3300.65 grams) of mixed product methamphetamine to him. (Aplt. Br. at 6; Aple. Br. at 3.) They disagreed, however, about the purity of the 3.3 kilograms for an undetermined yield of pure methamphetamine. Mann admitted in his plea colloquy that the 3.3 kilograms of substance was methamphetamine,[4] but neither party had the drug tested in a laboratory for its degree of purity. On August 19, 2002, the district court heard arguments on purity at Mann's sentencing.[5]

At sentencing, the government introduced testimony from three witnesses. The first witness, Andres Torres Sanchez, testified that he had cooked methamphetamine with Mann, and described in detail the recipe they used. (Dist.

---

[4]

| Question: | Using [the substance you had manufactured], did you, in fact, know that what you had cooked was, in fact, methamphetamine? |
| Defendant: | I would say "Yes." Yes, ma'am. |
| Question: | If a chemist had been able to analyze the substance that you cooked on those occasions at the Brighton Apartments, would have you any dispute with a statement that it was, in fact, methamphetamine that you manufactured? |
| Defendant: | No, I wouldn't have a dispute with that. No. |

(Plea Colloquy at 10.)

[5] Mann concedes that the district court properly had the power to conduct this hearing and determine the quantity and purity of methamphetamine "by use of circumstantial and historical evidence." (Aplt. Br. at 17.)

Ct. Op. at 2.) Sanchez had ingested the methamphetamine they cooked and described it as of "good quality" and having a purity of "nine" on a scale of one to ten. (Id.) The second witness called by the government was Inspector Mark Danner of the Oklahoma City Police Department, a veteran law enforcement officer with fourteen years of experience in narcotics. (Id.; Sentencing Tr. Vol. 1 at 43.) Inspector Danner testified that the pseudoephedrine/red phosphorous reduction method Sanchez had described was the predominant method to cook methamphetamine in the area, and that the purity of methamphetamine on the streets in Oklahoma was typically between fifty-seven and ninety-six percent. (Dist. Ct. Op. at 2-3.) The final witness called by the government was Lori Ann Callaway. Callaway testified that she had used the methamphetamine cooked by Mann and that his product was "good," "very good," and "ten" on a scale of one to ten. (Id. at 3.)

Mann called one witness to testify on his behalf. Gene Gietzen, a forensic scientist and owner of a consulting firm in Missouri, testified that the purity of illegal methamphetamine in his own experience ranged from four percent to the "high eighties." (Id.) He also noted that the Drug Enforcement Administration's website recorded the average purity of illegal methamphetamine submissions to be thirty-five percent in 2000, and forty percent in 2001. (Id.) On cross-examination, however, Gietzen admitted that a highly-regarded article by Forensic

Science International in 1991 had found the generally accepted purity level of methamphetamine produced by clandestine laboratories to be ninety-five percent. (Id. at 3-4.)

The district court ultimately found that the government had proven by a preponderance of the evidence that the methamphetamine Mann produced was at least fifty-seven percent pure, the lowest level of purity in Oklahoma and well within the range given by Mann's defense expert as comporting with his personal experience. (Id. at 6.) If the 3.3 kilogram mixture were fifty-seven percent pure, Mann would be responsible for 1.88 kilograms of methamphetamine. (Id. at 7.) This gave him an offense level of 39, and a sentencing range of 262 to 327 months. (Id.)

Mann now alleges that he should not be bound by his waiver of appeal because the government acted in bad faith at the hearing on two issues. First, Mann alleges that, despite agreement in the PSR that Mann would be responsible for 3.3 kilograms of mixed substance, the government solicited testimony from its witnesses regarding additional quantities of methamphetamine he was responsible for manufacturing in addition to the purity of his mixture. (Aplt. Br. at 9.) During the hearing, the government asked Sanchez how many cases of pseudoephedrine would make a pound of methamphetamine. (Sentencing Tr. Vol. I at 28.) The government also asked Inspector Danner how much

methamphetamine Mann manufactured at one time and how it was distributed to others.  (Id. at 48-49.)  Mann objected both times at the hearing that quantity was not at issue.  The government explained that the amount of pseudoephedrine added to the mixture, as well as the amount of the methamphetamine manufactured at one time could be relevant to the question of purity.  (Id. at 29, 48-49.)  The district court overruled Mann's objections and permitted the testimony.  (Id. at 29, 49.)

Second, Mann alleges that, despite the fact that the government had warned him in the PSR only about information it had gleaned from Callaway about Mann's potential leadership role, the government solicited testimony at the sentencing hearing regarding Mann's role in the conspiracy to manufacture, possess, and distribute methamphetamine from other sources as well.  (Aplt. Br. at 12.)  During the hearing, Sanchez testified that Mann had led or organized at least five other people in addition to Callaway.  (Id.; Sentencing Tr. at 33-36.)  The district court overruled Mann's objection to this testimony and permitted the government to use it in supporting the sentencing enhancement for a leadership role under U.S.S.G. §3B1.1(b) or (c).  (Sentencing Tr. at 33, 37.)

We hold that neither of Mann's allegations demonstrates that the government acted in bad faith or breached the terms of the agreement.  As the district court found, the few references to quantity in witness' testimony were

relevant to the question of purity, especially given the detail of information presented about the recipes involved.  Finally, although it would have been preferable for the government to have warned Mann about the testimony Sanchez would give about leadership, we find no violation of the terms of the plea agreement at the time Mann plead guilty.  Brye, 146 F.3d at 1210; Peterson, 225 F.3d at 1170-71.  Sanchez's testimony about leadership does fall into the general category of information that the government warned Mann it intended to present in the plea agreement.  The evidence properly shed light on whether Mann's offense level should have been enhanced for having an important leadership role under U.S.S.G. §3B1.1(b) or (c).  (Plea Agreement at ¶7); cf. also United States v. Hand, 913 F.2d 854, 856-57 (10th Cir. 1990) (holding that the government is not obliged to "stand mute in the face of incorrect or misleading testimony offered before the trial court").

Accordingly, we hold Mann to the terms of his waiver of appeal and AFFIRM his conviction.  The government's motion is DISMISSED as moot.

ENTERED FOR THE COURT


David M. Ebel
Circuit Judge